IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| TIFFANY FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 14-3477-CV-C-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Tiffany Foster seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits from November 13,

2006 (her application date) to April 1, 2010 (the date SSA found her to be disabled).

Plaintiff argues that the ALJ erred in evaluating the opinions of plaintiff's treating

psychiatrists and in finding plaintiff not credible. I find that the ALJ's opinion is not

supported by substantial evidence in the record as a whole. Therefore, plaintiff's

motion for summary judgment will be granted, the decision of the Commissioner will be

reversed, and this case will be remanded for an award of benefits dating back to

November 13, 2006.

## I.    BACKGROUND

On November 13, 2006,  plaintiff applied for disability benefits alleging that she

had been disabled since May 2, 2003.  Plaintiff's disability stems from mood disorders

and anxiety related disorders.  Plaintiff's application was denied on March 8, 2007.  On

February 5, 2009, a hearing was held before an Administrative Law Judge.  On March

31, 2009, the ALJ found that plaintiff was not under a "disability" as defined in the

Social Security Act. The ALJ found that plaintiff's impairments, including substance use disorder, met listings 12.04, 12.06 and 12.09; however, if plaintiff stopped the substance use, her impairments would not meet any listed impairment and she would be able to perform substantial gainful activity. On August 4, 2010, the Appeals Council denied plaintiff's request for review.

Meanwhile, on April 6, 2010, plaintiff filed a second application for disability benefits. Plaintiff's application was granted and she was determined to have become disabled on April 1, 2010. Plaintiff appealed her first claim to the United States District Court; and on April 25, 2011, on motion of the government, the case was reversed and remanded for further consideration. The Appeals Council directed the ALJ to evaluate plaintiff's subjective complaints and determine whether her substance abuse was a contributing factor material to a finding of disability, utilizing the testimony of a medical expert to separate the effects of plaintiff's substance abuse from the effects of her other mental impairments. A supplemental hearing was held on January 4, 2013, and on January 24, 2013, the ALJ found that plaintiff was not under a disability prior to April 1, 2010. On September 9, 2014, the Appeals Council denied review.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d

2

178, 179 (8th Cir. 1997); <u>Andler v. Chater</u>, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is

Case 6:14-cv-03477-REL    Document 18    Filed 11/05/15    Page 3 of 55

unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes =  go to next step where burden shifts to Commissioner.

Case 6:14-cv-03477-REL   Document 18   Filed 11/05/15   Page 4 of 55

5.      Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Janice Hastert, in addition to documentary evidence admitted at the hearing.

### A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

Plaintiff earned income during the following seven years:

| | |
|---|---|
| 1988 | $ 31.05 |
| 1989 | 822.60 |
| 1990 | 973.38 |
| 1992 | 591.74 |
| 1995 | 1,252.15 |
| 1996 | 333.75 |
| 1997 | 578.92 |

During all other years from 1991 through the present, plaintiff's annual earnings were zero (Tr. at 102, 419, 444-445).

**Letter from Probation Officer**

On June 5, 2008, plaintiff's probation officer, Shellena Dawson, wrote a letter to whom it may concern (Tr. at 21, 446, 483-484). Plaintiff was on probation supervision

for a conviction for possession of drug paraphernalia.  Since she began supervision in

2005, she had reported regularly and attended counseling as directed.  The letter

indicates that the State of Arizona would not discharge plaintiff from probation because

she had not been able to pay the complete court-ordered assessments.  "Foster has

continued to work on her sobriety and tested negative on all urinalysis since

06/16/2006."

**Disability Report - Field Office**

In a face-to-face interview with plaintiff, on December 27, 2006, P. Smith noted

that plaintiff was "obviously rattled.  She was crying throughout the interview." (Tr. at

106).

**Function Report**

In a Function Report dated January 10, 2007, plaintiff reported that her mental

condition affects her ability to understand, follow instructions, concentrate and get along

with others (Tr. at 122).  She does not get along with authority figures and was "let go"

from all of the jobs she tried (Tr. at 123). She does not handle stress well (Tr. at 123).

She does not handle changes in routine well (Tr. at 123).

**B.     SUMMARY OF MEDICAL RECORDS**

On April 25, 2005, plaintiff saw Kathy Geery, a social worker, who performed a

comprehensive clinical assessment (Tr. at 137-140).  Ms. Geery noted that plaintiff

"continued to rock back and forth in her chair."  Plaintiff stated that she was assessed

with bipolar disorder when she was 17.  She has depressive episodes where she feels

sad and sleeps all the time, and she has hypomanic episodes during which she is

6

awake for 3 or 4 days at a time and is very energetic.  She experiences panic attacks 2 to 3 times per day during which she shakes, sweats, gets short of breath and feels like her heart is pounding.  Plaintiff had recently moved to Missouri from Arizona and had not had the money to fill her prescription. The week before this appointment, she was having a bad episode and "trashed" her house.  She asked a friend to take her to the emergency room before her kids got home from school so they would not have to see her like that.

Plaintiff had been on and off medications since age 17 -- her father had always encouraged her to handle her disorder without medication.  Plaintiff denied ever having used alcohol.  Her father is an alcoholic.  Plaintiff used marijuana for about a year in high school.  Plaintiff uses caffeine extensively -- she drinks a 12-pack of soda per day and about two gallons of tea per day.  Plaintiff reported a history of verbal and physical abuse.  Plaintiff had twin daughters in 1998.  Their father died in 2002 from a heroin overdose.  Her in-laws live in Missouri and are very supportive.  Plaintiff's mother left when plaintiff was a toddler, and plaintiff was raised by her father for most of her childhood.  Plaintiff's mother remarried and had three more children.  Plaintiff's mother took her out of school when she was in 9th grade to help raise her half-sisters. Because of behavior problems, plaintiff's father put her in foster care at age 15.

Plaintiff reported spending all of her time cleaning.  She said she cannot leave her house until everything is clean and it takes a significant amount of time for her to get ready to go anywhere because of her cleaning which causes her a lot of stress. Plaintiff's obsessive behaviors were described as compulsive, excessive, unreasonable,

time consuming, and a cause of significant distress.  Plaintiff had not worked since 1997 and was receiving financial help from her friends and family.  Ms. Geery assessed bipolar II disorder, panic disorder without agoraphobia, and rule out obsessive compulsive disorder.  She assigned plaintiff a GAF score of 44 to 47.[1]

On June 23, 2005, plaintiff saw Patricia Carson, APRN, BC[2] (Tr. at 154).  Plaintiff reported having moved here recently in an effort to provide a better home life for her children.  Her children's grandmother lived nearby and helped with childcare.  "Tiffany states that she loses her temper at least daily, that it is irrational, she acknowledges that there is certainly a pay back to it, but feels like she is not in control of it."  Plaintiff had not used birth control in six years and stated that she believed she became infertile after a previous medical procedure.  Ms. Carson observed that plaintiff appeared anxious.  She prescribed Lexapro[3] and Trileptal.[4]

On August 16, 2005, plaintiff saw Patricia Carson, APRN, BC (Tr. at 153).  "Tiffany is extremely uncomfortable today.  She almost looks as though she has akathisia[5] and the description of how she is internally feeling would match that also.

---

[1]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[2]Advanced Practice Registered Nurse, Board Certified.

[3]Laxapro treats depression and generalized anxiety disorder.

[4]Trileptal is an anticonvulsant used to treat bipolar disorder.

[5]Akathisia is a neuropsychiatric syndrome characterized by subjective and objective psychomotor restlessness.  Patients typically experience feelings of unease, inner

The other differential could be just significant severe anxiety and obsessive compulsive [disorder]. She describes being caught in the house for 45 minutes at a time when she is already late because she has to be checking things. She also states that her shoulders, her neck and her jaw feels extremely tense and that she is having difficulty being able to sit still and she feels like she is crawling out of her skin." Ms. Carson observed that plaintiff appeared very uncomfortable. She assessed "not doing well." She discontinued plaintiff's Trileptal and prescribed Clonazepam (treats panic disorder and anxiety).

On September 8, 2005, plaintiff saw Patricia Carson, APRN, BC (Tr. at 152). Plaintiff's boyfriend was with her. She reported continued pain in her joints and a sense that her muscles were always tense and she could not relax. Plaintiff's Clonazepam was increased and she was told to continue with Lexapro.

On November 14, 2005, plaintiff saw Patricia Carson, APRN, BC (Tr. at 151). "Tiffany for the first time today decided that she needed to be forthcoming about her history. She gives a history of twenty-one years of methamphetamine abuse with her mother having introduced it to her when she was age thirteen. . . . She states that she has been clean for six months possibly a little longer. She has had two relapses during that period of time both of them very short. She denies having an adequate diagnosis secondary to not being forthcoming about her previous past drug abuse. She does have significant Obsessive/Compulsive Disorder components, which appear to have

_____

restlessness mainly involving the legs, and a compulsion to move. Most engage in repetitive movement. In clinical settings, akathisia usually is a side effect of medication. Antipsychotics, serotonin reuptake inhibitors, and buspirone are common triggers.

9

been present prior to drug abuse during her early childhood."  Ms. Carson observed

that plaintiff was "positive for a mood instability, positive for push of speech, positive for

tangentiality."  Plaintiff's Clonazepam was discontinued but she was told to use the

ones she had left on an as-needed basis for extreme anxiety.  Her Lexapro was

discontinued and she was started on Effexor XR.[6]

On March 17, 2006, plaintiff saw Elizabeth Bhargava, M.D., a psychiatrist (Tr. at

148-150, 233-235).  Plaintiff indicated she needed help for obsessive-compulsive

behavior.  "Ms. Foster tells me that she is a recovering methamphetamine addict.  She

has used methamphetamine for 21 years, quit for a year and has relapsed a few weeks

ago.  She was referred to me by Melissa Bosserman her therapist. She describes

severe obsessive-compulsive symptoms where she has an intense need to continue

vacuuming her house even after she has done it 20 times over and to clean the counter

top, everything needs to be immaculate and clean.  She cannot leave the house without

checking all the doors.  She says she has been this way ever since she was a child and

now it is driving her crazy because she is unable to function outside the home.  She

would like to get a job.  She constantly has thoughts racing through her head.  She

does not sleep well at night; she gets between three and a half to six hours of sleep.

She is tired during the day, her appetite is poor.  She is depressed, she has difficulty

with focusing.  She has poor motivation and is often crying.  She has panic attacks one

to three times a day lasting about 45 minutes. . . .  She does report mood swings and

---

[6]Effexor XR is a serotonin and norepinephrine reuptake inhibitor used to treat
generalized anxiety disorder, panic disorder, depression, and social anxiety disorder.

irritability.  She does report a couple of days when she has increased energy and will be

doing a lot of things related to cleaning the house but it seems to be fueled by anxiety, it

does not sound like a clear cut manic episode."  Plaintiff reported having been in

counseling since age 17 with one prior hospitalization due to depression.  "[S]he has

had a methamphetamine addiction for 21 years, from the time she was 13 years old,

she tells me that she had an alcoholic abusive father, mother left her when she was

two.  There was constant anxiety at home and at 13 yrs she began living on the streets.

She began smoking the methamphetamine as well as marijuana on a daily basis till one

year ago.  She did get in trouble due to her methamphetamine use and has been put

on probation in Arizona.  She got that moved to Missouri. . . .  [S]he did give me

permission to speak to her [probation officer].  Due to her recent relapse she is

probably going to have to go to inpatient rehabilitation, she does report concerns about

this due to an increase in cravings when she is around other drug using people.  She

tells me that her recent relapse was because a friend of her ex-husband's came to town

and offered her the methamphetamine.  She was upset at her boyfriend and relapsed. .

. .  Her father suffered from depression and is an alcoholic.  I have seen her father in

the inpatient unit.  He has had a history of methamphetamine use, prescription drug

abuse, and a question of bipolar disorder."  Plaintiff's current boyfriend was described

as supportive and was not a drug or alcohol user.  Dr. Bhargava observed that plaintiff

was rocking in her chair.  Her mood was noted to be depressed and anxious.  Dr.

Bhargava assessed obsessive-compulsive disorder, methamphetamine dependence

with recent relapse, panic disorder with agoraphobia, and cannabis dependence in full

sustained remission. Her GAF was 45. Dr. Bhargava ordered blood work and a urine drug screen. She prescribed Abilify,[7] Effexor XR, and Luvox.[8]

On March 27, 2006, plaintiff saw Elizabeth Bhargava, M.D. (Tr. at 146, 231). Plaintiff reported severe vomiting due to using Abilify. Her insurance would not pay for the Luvox. Plaintiff reported continued problems at home including her continued compulsive cleaning. Dr. Bhargava noted that plaintiff was rocking in her chair but noted that she was "working hard to attempt to get insight into her condition." Dr. Bhargava prescribed Clomipramine[9] and Neurontin[10] and noted that she would consider prescribing Risperdal[11] down the road if the other two medications were not effective.

On April 6, 2006, plaintiff saw Elizabeth Bhargava, M.D. (Tr. at 145, 229). Plaintiff reported no significant improvement with Clomipramine and Neurontin; however, Dr. Bhargava observed that plaintiff seemed a lot calmer and was not rocking in the chair as she normally did. Plaintiff was planning to enter rehab on April 24. She complained of ongoing irritability and obsessive compulsive behavior. Dr. Bhargava increased plaintiff's dosage of Clomipramine and Neurontin.

_____

[7]Abilify is an antipsychotic used to treat schizophrenia, bipolar disorder and depression.

[8]Luvox is a selective serotonin reuptake inhibitor used to treat symptoms of obsessive-compulsive disorder.

[9]Clomipramine is a tricyclic antidepressant used to treat obsessive-compulsive disorder.

[10]Neurontin is used to treat restless leg syndrome.

[11]Risperdal is an antipsychotic used to treat schizophrenia and bipolar disorder.

12

On June 14, 2006, plaintiff saw Melissa Bosserman, a social worker (Tr. at 163-164). "The client is confident that she can return to clean and sober living after having relapsed briefly following a period of substantial sobriety." Plaintiff had recently completed inpatient treatment. Plaintiff was told that Ms. Bosserman was leaving and she would need to transition to a new therapist, which was the focus of the session.[12] GAF was 31-40,[13] stress severity rating was "severe."

On June 21, 2006, plaintiff saw Christine Adcock, FNP, BC[14] (Tr. at 158-160). Plaintiff had been experiencing pelvic pain, worsening over the past two days. She said she had a positive pregnancy test the week before, had an ultrasound, and was told she may have an ectopic pregnancy (Tr. at 181). A repeat pelvic ultrasound was scheduled for later that morning.

On July 21, 2006, plaintiff underwent surgery due to a blocked fallopian tube which had originally been diagnosed as a recent miscarriage, and during the surgery extensive adhesions of the bowel were discovered and addressed (Tr. at 176-179, 182-186). She was discharged on July 23, 2006. Brian Israel, M.D., noted that during

---

[12]Curiously, this record states that Ms. Bosserman was leaving and plaintiff would have to transition to a new therapist; and the record dated November 2, 2006 (four and a half months later) indicates that it was the first time the therapist had met with plaintiff -- yet Ms. Bosserman is the therapist listed on both of these records.

[13]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

[14]Family Nurse Practitioner, Board Certified

13

plaintiff's visit the day before her surgery, she was rocking back and forth in her chair and appeared to be very uncomfortable.

On August 29, 2006, plaintiff saw Elizabeth Bhargava, M.D. (Tr. at 143-144, 227-228). Plaintiff reported having participated in rehab and due to nausea and vomiting she had discontinued Neurontin and Clomipramine although she thought they were probably helpful. After her discharge from rehab, she went to urgent care and discovered she was pregnant. It was a tubal pregnancy which required an operation. During the operation it was discovered that her intestines had significant adhesions and that had to be operated on as well. "She was in the hospital for quite some time. Since her return home she has her good days and bad days but lately she has been more emotional and has been crying." Plaintiff stated that this was a good day, and Dr. Bhargava observed that plaintiff was able to sit in the chair without rocking. Dr. Bhargava started plaintiff on Prozac.[15]

On October 23, 2006, plaintiff saw Elizabeth Bhargava, M.D. (Tr. at 141, 225). Plaintiff had stopped using Prozac because she felt it was not useful and because of a pregnancy; however, her mood had dropped and her panic attacks and agoraphobia had worsened. She had not left the house for two weeks and was described by Dr. Bhargava as "very distraught." "She missed her last couple of appointments for this reason. Finally her husband kicked her out and told her to get the help that she needed." Dr. Bhargava observed that plaintiff was tearful, very anxious and rocked in

_____

[15]Prozac is a selective serotonin reuptake inhibitor used to treat depression and obsessive-compulsive disorder.

her chair. She assessed bipolar disorder, obsessive compulsive disorder, methamphetamine dependence in early remission, and panic disorder with agoraphobia. She discontinued Prozac and prescribed Clomipramine, Ativan,[16] and Topamax.[17]

On November 2, 2006, plaintiff saw Melissa Bosserman, a social worker (Tr. at 165-166). "The client's repetitive and compulsive behavior is engaged in to prevent some dreaded situation from occurring, which the client is often not able to define clearly." Plaintiff was described as anxious. "Symptoms evident at the time of this session include: agoraphobia, OCD, sleep disturbance, relationship problems [separated from significant other]." Plaintiff had recently been in rehab - "[s]he states she is now sober. . . . OCD appears related to childhood defense against her alcoholic father. Father would get drunk and physically abuse the patient. Patient [would] go to her bedroom, locking the door and the[n] rearranging the room in an OCD manner." GAF was 31-40, stress severity rating was "severe." Counseling was provided.

Plaintiff completed her application for disability benefits on November 13, 2006, which is the beginning of the relevant time period in this case.

On November 16, 2006, plaintiff saw Melissa Bosserman, a social worker (Tr. at 167-168). "The client was noted to have made many attempts to ignore or control the compulsive behaviors and obsessive thoughts, but without any consistent success." Plaintiff was described as anxious. "[S]he engages in a rocking behavior which she

---

[16]Ativan is a benzodiazepine used to treat anxiety with depression.

[17]Topamax is an anticonvulsant used to treat bipolar disorder.

acknowledges is self soothing." GAF was 31-40, stress severity rating was "severe." Counseling was provided regarding plaintiff's obsessive compulsive disorder.

On December 6, 2006, plaintiff saw Richard Porter, a social worker (Tr. at 169-170). "The client reported failure at attempts to control or ignore her obsessive thoughts or impulses. It was noted that the client gave evidence of compulsive behaviors within the interview." Plaintiff was described as anxious. "Symptoms evident at the time of this session include: Compulsive behavior, agoraphobia, crying spells, loss of interest in pleasurable activities, hypersomnia." Plaintiff stated that "sobriety has made things worse with regard to her OCD. She does not want to go back to meth use, but feels that it did help cover over her mental health problems." GAF was 31-40, stress severity rating was "severe." Counseling was provided.

On December 18, 2006, plaintiff saw Richard Porter, a social worker (Tr. at 171-172). "Through a clinical interview, the client described a severe degree of interference in her daily routine and ability to perform a task efficiently because of the significant problem with obsessive thoughts and compulsive behaviors." Plaintiff was observed to be depressed. "Symptoms evident at the time of this session include: crying without reason, emotionality, fighting with boyfriend, cravings." GAF was 31-40. Counseling was provided.

On January 8, 2007, plaintiff saw Richard Porter, a social worker (Tr. at 173-174). Plaintiff was observed to be anxious. "Symptoms evident at the time of this session include: Racing thoughts, anxiety, anger, and depression." The goal of counseling for this session was to "reduce overall level, frequency, and intensity of the

anxiety so that daily functioning is not impaired."  GAF was 31-40, stress severity rating was "severe."  Plaintiff had to talk with her probation officer about her psychiatric problems.  "This took a lot of courage, as she has wanted to present the best face forward to her PO."  Counseling was provided.

On February 20, 2007, plaintiff saw Elizabeth Bhargava, M.D. (Tr. at 223-224). "Ms. Foster states that she moved out of her home with her two daughters.  They have now found other housing.  She states that she and her husband could not get along. He was also accusing her of getting fat.  She had a couple of really rough months.  She missed a number of appointments.  She has been somewhat paranoid in the new home, because there is no other adult at home.  She has not been taking her medications since she ran out but she states that they were helpful while she took them.  She was less anxious and less irritable.  She does admit to having used diet pills called Dexatrim.[18]  However, she discontinued them after she had an episode where she had chest pain, could not see, and collapsed on the floor.  She was taken to the emergency room and they told her to discontinue taking the pills.  She tells through all of this she has been regular in attending therapy with Richard Porter."  Dr. Bhargava assessed continued symptoms and continued noncompliance. She restarted Clomipramine and Topamax.

---

[18]Dexatrim is a brand name for phenylpropanolamine, a decongestant.  In 2013, following the request of the FDA to discontinue marketing drug products containing phenylpropanolamine due to studies showing an increased risk of hermorrhagic stroke and myocardial injury, this active ingredient was replaced in Dexatrim.

17

On February 28, 2007, plaintiff underwent a clinical psychological evaluation by Robert Forsyth, Ph.D., at the request of Disability Determinations (Tr. at 189-191). Plaintiff had never had a driver's license because she was never able to comprehend the written exam.  Dr. Forsyth observed that she was "only a partially helpful historian, frequently saying she could not remember but she did seem to try. . . .  She seemed very anxious, labile and tearful."  Plaintiff had been in psychotherapy for years.  She "appeared quite distracted showing problems with concentration and memory. . . .  She admitted to significant illegal drug abuse history in the past including marijuana and meth for 20 years since she was about 13 though she said she has been clean for almost 2 years 'in April'."  Plaintiff had been in outpatient drug abuse therapy for the past two years and continued attending at Behavioral Health Care and Burton Creek. Plaintiff attended school through 9th grade, had attention and concentration problems, and got mostly Cs and Ds.  Plaintiff described her day as housecleaning, rearranging her house and keeping things organized.  "She does admit to some obsessive compulsive tendencies."  Plaintiff again was described as very tearful, and she described herself as compulsive and dysfunctional.  She said she cannot leave her house and often feels rather paranoid.  "Sometimes during the assessment she would rock back and forth and her little girls were with her and seemed concerned about her and appeared to be trying to assist her as best they could. . . .  She showed anxious and depressed mood and was cooperative overall but seemed very distressed in answering questions and in some cases did not want to talk about her answers in any length, just make a brief response and move on. . . .  The quality of her thinking was

impaired.  She could only relate to 2 of 4 proverbs presented to her.  Abstract

conceptual thinking was mildly impaired. . . .  She counted to 40 by 3s in 25 seconds

making 2 errors that appeared to be related to concentration and mental focus.  Social

judgment skills were impaired. . . .  Intellectually she appeared to be functioning in the

low average range at best. . . .  [W]hen asked the month of Labor Day she said 'shit'

and seemed quite flustered.  She said she couldn't remember.  She admitted that

sometimes when she is flustered it seems like her memory is very poor.  She could not

remember what Martin Luther King, Jr., was famous for but did say she had heard the

name.  Math functions were somewhat uneven. . . .  She was able to make change

after a purchase but said she had no idea how many inches there were in 2 1/2 feet.

She needed a repeat of questions several times and did show mental focus and

concentration as well as anxiety problems in problem solving. . . .  Interacting socially

and adapting to her environment would clearly be her most problematic area.  She is

tearful and reactive and appears to be very unstable emotionally.  She said she has

been clean for almost 2 years but does not appear to have a very good recovery or

stability at this time and may need further or continued ongoing treatment to assist in

her stabilization and recovery process.  She does not  . . . have much of a support

system other than her ongoing outpatient visits but this appears to be insufficient to

deal with the severity of her problems."

Dr. Forsyth assessed bipolar mood disorder type II, obsessive compulsive

disorder, posttraumatic stress disorder, substance abuse in remission, and rule out

learning disability not otherwise specified.  Her GAF was 45.

On March 8, 2007, Kenneth Burstin, Ph.D., a non-examining, non-treating psychologist, completed a Mental Residual Functional Capacity Assessment (Tr. at 192-194). Dr. Burstin found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

Dr. Burstin found that plaintiff was moderately limited in the following:

- The ability to understand and remember detailed instructions

20

- The ability to carry out detailed instructions

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

No explanation for the findings was provided.

That same day Dr. Burstin completed a Psychiatric Review Technique (Tr. at 195-206) finding that plaintiff suffers from mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. He concluded that plaintiff is able to sustain at least simple tasks in settings with limited interpersonal demands.

On May 30, 2007, plaintiff saw Elizabeth Bhargava, M.D. (Tr. at 221-222). "Ms. Foster is now off the Topamax. She is only taking the Clomipramine. She tells me she is irritable and on edge, her thoughts are racing and she needs her mood stabilizer. We discussed various options. She states that she does not care anymore about the weight gain." Dr. Bhargava observed that plaintiff's mood was depressed and anxious. She prescribed Depakote[19] and Hydroxyzine[20] and continued plaintiff's Clomipramine.

On August 3, 2007, plaintiff saw Elizabeth Bhargava, M.D. (Tr. at 219-220). "Ms. Foster talks about getting paranoid periodically where she has an overwhelming sense of needing to close the doors and windows and keep the room dark. The feeling may

---

[19]Depakote is an anticonvulsant used to treat bipolar disorder.

[20]Hydroxyzine is an antihistamine used to treat anxiety, tension, and nervousness.

last for minutes to a couple of hours and then it just leaves all of a sudden.  It may occur at any point of the day. . . .  She feels as if it controls her."  Plaintiff's mood and affect were anxious.  Dr. Bhargava continued plaintiff's Depakote and Hydroxyzine, increased her Clomipramine and added Risperdal, an antipsychotic, for anxiety.

On September 27, 2007, plaintiff saw Elizabeth Bhargava, M.D. (Tr. at 217-218). Plaintiff continued to have problems with anxiety and had been having difficulty falling asleep.  Dr. Bhargava observed that plaintiff's mood was anxious and her affect was anxious.  "She was rocking in her chair."  Plaintiff had no change in her obsessive symptoms.  Dr. Bhargava continued plaintiff on her medications and added Lunesta[21] as a sleep aid.

On October 26, 2007, plaintiff saw Elizabeth Bhargava, M.D. (Tr. at 215-216). Plaintiff reported having been depressed.  "She states her moods go up and down. One minute she is high and the next minute she is depressed."  Plaintiff continued to be compulsive about cleaning.  Dr. Bhargava observed that plaintiff's mood was depressed and her affect was restricted, but she was not as anxious as normal.  She increased plaintiff's Depakote dosage and continued Clomipramine, Risperdal, Hydroxyzine and Lunesta.

On January 23, 2008, plaintiff saw Elizabeth Bhargava, M.D. (Tr. at 213-214). "Mrs. Foster tells me she has run out of everything except for the Depakote and Clomipramine two weeks ago.  She did not have the money to get her refill.  She is expecting her sister-in-law to be able to loan her some money today, but she has been

---

[21]Lunesta is a nonbenzodiazepine hypnotic used to treat insomnia.

very anxious and paranoid. She states that there was only one occasion when she had cravings to use substances about three weeks ago. Her sister-in-law came home and prayed with her and that helped a great deal. . . . As long as she is on her medications she tells me she does really well. She has been good about attending her therapy appointments as well as her medication appointments." Dr. Bhargava observed that plaintiff appeared very anxious. She assessed bipolar disorder, panic disorder with agoraphobia, obsessive compulsive disorder, and amphetamine dependence in early remission. She prescribed Depakote, Clomipramine, Risperdal, Hydroxyzine, and Lunesta.

On April 24, 2008, plaintiff saw Elizabeth Bhargava, M.D. (Tr. at 211-212, 236-237). "Ms. Foster tells me that she has been very tense. Her muscles are tight around the shoulders and back. She has not quit her compulsive behaviors. She has cut down some on her sodas and has lost five pounds. She has not kept any of her appointments with Case Management and was told that she needed a new referral if she was to restart." Dr. Bhargava observed that plaintiff's mood was depressed and anxious. Dr. Bhargava continued plaintiff's Depakote, Risperdal, Hydroxyzine, and Lunesta. She increased plaintiff's Clomipramine and added Cogentin.[22] "I reinitiated a referral for Case Management. She is to mention that she has been having enough Agoraphobia that she has not been leaving the house as needed."

_____

[22]Cogentin is used to control tremors and stiffness of the muscles due to certain antipsychotic medicines.

On May 28, 2008, plaintiff saw Dr. Bhargava, M.D. (Tr. at 238-239). "Ms. Foster comes in, in a lot of pain. She tells me she fell on her tail bone yesterday. Adding the Cogentin did not help her with the muscle stiffness. She does, however, notice an improvement in anxiety and depression with the increase in the Clomipramine. She has been seeing Nancy Jacobson. She has not been seeing Richard Porter for a long time. I encouraged her to see a therapist. Nancy Jacobson has referred her to the IDDT."[23] Dr. Bhargava noted improved emotional symptoms but that plaintiff was in considerable pain. She continued plaintiff's Depakote, Risperdal, Clomipramine, Hydroxyzine and Lunesta; she increased plaintiff's Cogentin; and she prescribed Flexeril (a muscle relaxer). She initiated a referral for individual therapy.

On January 12, 2009, plaintiff saw Elizabeth Bhargava, M.D. (Tr. at 240-241). "I last saw Ms. Foster in May of 2008. She said by July she had run out of her medications. She no-showed two subsequent appointments. She states that she has been terrified of leaving her house. Depression, anxiety and compulsive behaviors have increased. She has also been having visual hallucinations." On exam plaintiff's pulse was 101. "She denies any use of methamphetamine in the last six months but does state that she has taken a few hits of marijuana but it made her paranoid. Her mood was depressed and anxious. Her affect was tearful." Dr. Bhargava restarted Clomipramine and also prescribed Risperdal and Hydroxyzine. "She has been referred for therapy by her caseworker. She is to continue in case management and therapy."

_____

[23]Integrated Dual Disorder Treatment - group psychotherapy utilizes the social nature of substance abuse to inspire personal change.

On February 2, 2009, Dr. Bhargava completed a Medical Source Statement Mental (Tr. at 242-243). She found that plaintiff was not significantly limited in the following:

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to ask simple questions or request assistance

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

She found that plaintiff was moderately limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember detailed instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

She found that plaintiff was markedly limited in the following:

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

To each of the following, Dr. Bhargava responded, "no" -- whether plaintiff had the ability to understand, remember and carry out simple instructions on a sustained basis; the ability to make judgments that are commensurate with the functions of unskilled work, i.e., simple work related decisions, on a sustained basis; the ability to respond appropriately to supervision, coworkers, and usual work situations on a sustained basis; and the ability to deal with changes in a routine work setting. Finally, Dr. Bhargava noted that, "If drug addiction and/or alcoholism is a diagnosis, this statement sets forth the limitations and abilities remaining if the claimant stopped using drugs and/or alcohol."

On August 4, 2009, plaintiff saw Aaron Mills, M.D., due to becoming sick after having been prescribed an antibiotic (Tr. at 510-511). Plaintiff was taking

Risperidone,[24] Clomipramine, Chlorpromazine,[25] Buspirone,[26] Trazodone,[27] and

Benztropine Mesylate.[28] She was given a different antibiotic.

On August 9, 2009, plaintiff saw Elizabeth Porter, ARNP[29] (Tr. at 532-533, 605-

606). Plaintiff stated, "I just don't seem to be getting any better. I just have to depend

on everyone." Ms. Porter wrote, "She was last seen by Dr. Bhargava [on] January 12,

2009, and has been noncompliant with follow up before and after. She generally waits

[until] she is in crisis before she shows up according to the records. I am new to this

person. She has seen Jan Johnson, LCSW for therapy. . . . Doctor's last note

indicated that the patient was having visual hallucinations and paranoia. The doctor

had then referred her to therapy and case management. She had suicidal and

homicidal ideation at that time as well. . . . She states she has been clean and sober

for 3 years. . . . The minute she sat down she started rocking, even though the chair

was not a rocker. She rocked back and forth constantly throughout the 45 or 50 minute

session. . . . Eye contact was poor. She had a sad affect. At times it looked like she

---

[24]Risperidone is an antipsychotic used to treat schizophrenia and bipolar disorder.

[25]Chlorpromazine is a phenothiazine used to treat severe behavior disorders, mental disorders, and anxiety.

[26]Buspirone treats anxiety.

[27]Trazodone is a serotonin antagonist and reuptake inhibitor used to treat major depression, depressive disorder, and insomnia.

[28]Benztropine Mesylate is an anti-Parkinson's agent used to treat side effects that may result from taking antipsychotic medications.

[29]Advanced Registered Nurse Practitioner.

had hand tremors, but it was difficult to determine . . . She states she is depressed, but states the anxiety is much worse. . . . I also explored ways without medication that she can calm herself and I encouraged her to discuss this problem with her therapist. . . . She states she feels suspicious of people, but that is mainly because she has avoidant behaviors right now. . . . Insight and judgment is judged as poor. Impulse control is judged as poor. She appears very dependent upon the boyfriend who appeared supportive. We had him come in so I could explain the medications at length. He appeared interested and supportive." Plaintiff's GAF was 35. Her dose of Chlorpromazine was increased, her Risperdal was increased, Cogentin was added, Trazodone was increased, Vistaril (also called Hydroxyzine) was discontinued, BuSpar (also called Buspirone) was added.

On September 4, 2009, plaintiff saw Elizabeth Porter, AFNP (Tr. at 535-536, 608-609). "Records indicate she has been rather noncompliant with followup, missing many appointments. She claims it is because of her agoraphobia; however, she apparently does not call to cancel. The doctor's last note indicated that she was having some visual hallucinations and paranoia and she was referred to regular therapy and case management." Ms. Porter observed that plaintiff appeared "rather anxious. She was noted for excessive rocking back and forth." Plaintiff reported continuing to stay in her house a lot. She reported feeling paranoid and having heard voices at times but she denied current visual hallucinations. "I spent some time with some active listening and encouraged her to open up the house more and let some more light in and to have more lights on in the house because her fear can even increase when it is kept too

dark. We did review at length risks, benefits, and alternatives of her medications." Ms. Porter increased plaintiff's dose of Clomipramine, increased her dose of Risperdal, added Cogentin, added Trazodone, added BuSpar, and discontinued Hydroxyzine.[30] She told plaintiff to return in three months.

On September 25, 2009, plaintiff saw Jan Johnson, a social worker, for individual psychotherapy (Tr. at 537-538). She observed that plaintiff's mood was depressed and she was crying. Plaintiff reported feeling overwhelmed and irritable, and she said she was having trouble sleeping. "Focal issue for today's session was being completely overwhelmed with her anxiety and depression. She was very proud to report she was able to go to her daughter's ball game for the first time ever recently." Her GAF was 44-47.

On September 29, 2009, plaintiff saw Richard Lucas, M.D., a psychiatrist (Tr. at 539-540, 603-604). "Tiffany reports she is feeling like crawling out of her skin. She reports this has been an ongoing issue and she has not been able to manage. . . . She described difficulty in early childhood in school of not being able to do well because she would lose focus, stare away, get out of [her] seat, talking out and impulsiveness and hyperactive. She reports that she still feels that way a lot of times. She finds herself quite distracted at times which is due to obsessive thoughts when [she] has two different tasks." Dr. Lucas observed that plaintiff was pacing, restless, agitated, labile, but able to be brought back to focus. He noted that plaintiff had a great deal of difficulty

---

[30]This part of the record may be carried over from the last appointment, because Ms. Porter indicates she discontinued medications that she had previously discontinued and added medications that she had previously added.

with feeling emotionally stable.  He continued her Risperdal, increased her BuSpar, restarted Lunesta, and prescribed Strattera.[31]

On October 2, 2009, plaintiff saw Jan Johnson, a social worker, for individual psychotherapy (Tr. at 541-542).  Plaintiff was noted to be anxious and was rocking.  Her GAF was 48-50.

On October 20, 2009, plaintiff saw Christine Adcock, a nurse practitioner (Tr. at 513-514).  Plaintiff had been coughing persistently for four days, and the coughing was worsening.  Plaintiff was taking Benztropine Mesylate, Risperidone, Chlorpromazine, Buspirone and Lunesta.  She was diagnosed with a sinus infection and was prescribed an antibiotic.

On October 21, 2009, plaintiff saw Richard Lucas, M.D. (Tr. at 543-544, 601-602).  "Tiffany states that she is overall doing somewhat better, but still quite anxious and distraught over her symptoms.  She has difficulties where she has intrusive thoughts and needs to check on things, such as the dryer, clothes, or doors.  She also gets quite distracted."  Dr. Lucas observed that plaintiff was moderately distraught, anxious, and dysphoric.  He noted that her OCD and ADHD appeared to be her predominant symptoms.  He continued her Risperdal, BuSpar, and Lunesta and added Methylphenidate.[32]

_____

[31]Strattera is a norepinephrine reuptake inhibitor used to treat attention deficit hyperactivity disorder.

[32]Methylphenidate is a central nervous system stimulant used to treat attention deficit hyperactivity disorder.

On December 21, 2009, plaintiff saw Richard Lucas, M.D. (Tr. at 545-546, 599-600). Plaintiff reported "significant difficulty with racing thoughts after starting the methylphenidate. . . . She also describes feeling increasing[ly] agitated and irritable and that other people need to understand that she needs things done such as the spots in the sink washed out. . . . There is a significant driven agitated state with restlessness." Dr. Lucas told plaintiff to discontinue all of her medications except Lunesta and he increased her Risperdal.

On December 24, 2009, plaintiff was taken to the emergency room (Tr. at 490-502) after having passed out (Tr. at 494). She reported anxiety, nausea, feeling lightheaded and dizzy. She was diagnosed with gastritis (inflammation of the stomach lining).

On January 11, 2010, plaintiff saw Aaron Mills, M.D. (Tr. at 515-517). Plaintiff complained of episodes of chest pain lasting for about an hour each time which had been occurring for about four weeks. The symptoms were associated with dizziness, nausea and syncope. Plaintiff was taking Risperidone, Clomipramine, Chlorpromazine, Buspirone, Benztropine Mesylate and Lunesta. Dr. Mills ordered blood work, an ECG, a carotid doppler, and a stress test. The ECG was normal (Tr. at 518).

On January 20, 2010, plaintiff saw Jeffrey Silverman, M.D., for a stress test (Tr. at 503-506, 521-523, 525). "Physical examination was unremarkable other than for some patient anxiety." Plaintiff reported experiencing a "head rush" similar to when she had been in the emergency room, and it was noted that she had sinus bradycardia (lower than normal heart rate) with normal blood pressure.

31

On February 2, 2010, plaintiff saw Richard Lucas, M.D. (Tr. at 547-548, 597-598). "Tiffany states that she was hospitalized and had a work up because she was becoming so anxious and having somatic concerns. . . . We reviewed her history again and she is having mostly symptoms of OCD with feeling that she cannot get thoughts out of her mind. She has constant checking and cleaning rituals." Dr. Lucas observed that plaintiff was "quite restless and has a difficult time staying still". He continued Lunesta and Risperdal and he started Prozac.

April 1, 2010, is the end of the relevant period in this case as plaintiff was found disabled as of this date.

On May 19, 2010, Richard Lucas, M.D., completed a Medical Source Statement - Mental (Tr. at 550-551). He found that plaintiff was moderately limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to make simple work-related decisions

- The ability to ask simple questions or request assistance

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

He found that she was markedly limited in the following:

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that she was extremely limited in the following

- The ability to understand and remember detailed instructions

- The ability to work in coordination with or proximity to others without being distracted by them

The form includes the following: "In responding, I have excluded from consideration all limitations which I believe result from the patient's drug addiction and/or alcoholism, if any."

On May 25, 2010, plaintiff saw Richard Lucas, M.D. (Tr. at 595-596). He prescribed Tenex[33] and Luvox.

On June 23, 2010, plaintiff saw Richard Lucas, M.D., who again changed her medication (Tr. at 592-594).

On July 19, 2010, Alan Aram, Psy.D., a non-examining, non-treating psychologist, completed a Psychiatric Review Technique (Tr. at 552-563). He found that plaintiff has mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence or pace. In support of his findings, Dr. Aram wrote that plaintiff was noted to wait until she was in crisis to return to a clinic, has a history of noncompliance, had stopped taking several medications while seeing Dr. Lucas (I note that Dr. Lucas had told plaintiff to stop all medications except Lunesta and Risperdal at the time of the record relied on by Dr. Aram). He noted that plaintiff's allegations were only "partially credible in that she minimizes the effects of her non-compliance."

On September 1, 2010, Richard Lucas, M.D., responded to a request by DDS for his opinion with regard to plaintiff's noncompliance (Tr. at 569). "Upon review of this claimant's medical records it appears there have been some compliance issues with regard to medications. To your knowledge, is the claimant currently compliant with her medications and treatment? If not, do you believe non-compliance is volitional or

---

[33]Tenex is a medication normally used to treat high blood pressure but is also used to treat attention deficit hyperactivity disorder as an alternative to stimulant medications.

related to the claimant's psychiatric disorder itself?" Dr. Lucas wrote, "Most likely disorder."

On September 15, 2010, Alan Aram, Psy.D., completed a second Psychiatric Review Technique (Tr. at 570). This time he found that plaintiff suffers from mild restriction of activities of daily living; marked difficulties in maintaining social functioning; and marked difficulties in maintaining concentration, persistence or pace. He cited Dr. Lucas's September 1, 2010, response to DDS indicating that plaintiff's non-compliance is related to her psychiatric disorder.

That same day, Dr. Aram completed a Mental Residual Functional Capacity Assessment (Tr. at 582-584). He found that plaintiff was moderately limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

He found that plaintiff was markedly limited in the following:

- The ability to understand and remember detailed instructions

35

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

On September 4, 2010, George Davis, Ph.D., reviewed plaintiff's medical records and provided an opinion as to plaintiff's functional abilities (Tr. at 616-636). He found that her limitations would not be disabling if drug and alcohol use were to stop based on her GAF deteriorating from 62 on May 28, 2008, to 50 on January 12, 2009, after she reported using marijuana once (Tr. at 636).

## C.    SUMMARY OF TESTIMONY

During the February 5, 2009, hearing, plaintiff testified as follows, needing to take breaks during the hearing due to becoming emotional (Tr. at 9, 287, 470):

At the time of this first hearing, plaintiff was 37 years of age (Tr. at 9, 287, 470) and is currently 44 (Tr. at 97). She has a ninth grade education (Tr. at 9, 287, 470).

Plaintiff has severe anxiety and severe depression (Tr. at 10, 288, 471). She has racing thoughts (Tr. at 10, 288, 471). Plaintiff likes to be at home and is uncomfortable when she is not "in her comfort zone" (Tr. at 10, 288, 471). Plaintiff has been receiving treatment for about five years at Behavioral Health Care (Tr. at 10, 288, 471). She believes the treatment has been helpful (Tr. at 10, 288, 471). Plaintiff is on medication, although the doctor has not yet found the right medication to balance plaintiff's ups and downs, her depression, and her compulsiveness (Tr. at 10, 288, 471). The doctor also provides counseling, and plaintiff sees a counselor in addition to her doctor (Tr. at 10-11, 288-289, 471-472).

Plaintiff's last job was working as a cashier in 1998 (Tr. at 9, 287, 470). She is unable to do that job because she cannot concentrate or focus; it is difficult for her to take in what is being taught (Tr. at 11, 289, 472). This has been a problem for plaintiff her entire life (Tr. at 11, 289, 472).

Plaintiff has a history of amphetamine dependence; however, it has been three years since she has used any (Tr. at 11, 289, 472). Plaintiff had a good probation officer who helped her get through her addiction (Tr. at 11, 289, 472). Since plaintiff stopped using amphetamine, a lot more things bother her; it is harder for her to accept or deal with reality (Tr. at 11, 289, 472). When plaintiff was using methamphetamine, she did not notice so many problems within herself (Tr. at 11, 290, 473).

Case 6:14-cv-03477-REL   Document 18   Filed 11/05/15   Page 37 of 55

Plaintiff had been living alone with her 10-year-old twin daughters, but for the past couple of months she and her twins had been living with her boyfriend because she had a couple of bad episodes and did not want to be home by herself with her kids (Tr. at 11-12, 290, 473). Her boyfriend helps her get the kids to school (Tr. at 12, 290, 473). Plaintiff has not been able to take the kids to school for the past few months; she has not been able to drive because she has been having a hard time (Tr. at 12, 290, 473). Her boyfriend prepares meals, but plaintiff does the cleaning because she wants it done a certain way (Tr. at 12, 290, 473).

During the day, plaintiff stays home and cleans (Tr. at 12, 291, 474). She stays home because she feels safe and secure there (Tr. at 12, 291, 474). Plaintiff believes that she functions appropriately doing housework; however, her family, children and boyfriend believe she is overly obsessive with how she cleans (Tr. at 13, 291, 474). She thinks they don't realize that she is just as overwhelmed as they are (Tr. at 13, 291, 474). Plaintiff does not go out in public if she doesn't have to -- she does not go to her daughters' school functions (Tr. at 13, 291, 474).

During the January 4, 2013, hearing, plaintiff was observed by the ALJ to be rocking (Tr. at 318), she had to take breaks, she had to be coached to take deep breaths or drinks of water to try to help her calm down and answer the questions (Tr. at 308, 309, 321). Plaintiff testified as follows:

Plaintiff is 5' 2" tall and weighs 130 pounds (Tr. at 303). Plaintiff had twin 14-year-old daughters and a six-month old daughter (Tr. at 303). Plaintiff had Medicaid

benefits but did not remember when she got Medicaid coverage (Tr. at 304). From 2006 through 2010 the only income plaintiff had was AFDC for her kids (Tr. at 304).

Plaintiff has never worked at a job for very long because she had a hard time taking in what her employer was trying to teach her (Tr. at 304). She was fired from a couple jobs because she could not remember what she was being taught (Tr. at 304-305).

During this time, her daughters' aunt took them to school and picked them up after school (Tr. at 306). Plaintiff did not do this because she did not like leaving her house, she was too nervous (Tr. at 306). Plaintiff had an off-and-on boyfriend from around 2003 until the birth of her youngest child, which is his child (Tr. at 306). They lived about ten minutes apart but he came over almost every day (Tr. at 307). The twins' grandmother also helped by taking the girls places including to medical appointments (Tr. at 307-308). Plaintiff did not go to her kids' medical and dental appointments (Tr. at 308). Plaintiff could not focus enough to be involved with those responsibilities (Tr. at 309). "I just have a hard time with that. I don't know why." (Tr. at 309). Plaintiff did not make the appointments, the girls' aunt did (Tr. at 309).

The ALJ asked plaintiff why she missed her own medical appointments sometimes during the relevant period (Tr. at 309-310). Plaintiff did not go to her appointments because she has a hard time leaving her house (Tr. at 310). When asked why she did not keep all of her appointments with her case manager, she said, "I don't even remember, I don't know, I don't remember. I haven't -- I don't know. That

Case 6:14-cv-03477-REL   Document 18   Filed 11/05/15   Page 39 of 55

was a while ago. I don't know, I don't even remember the lady's name. I don't know what was going on with me then. I don't remember." (Tr. at 310).

Plaintiff began using marijuana and methamphetamine at age 13 -- a family member introduced her to those drugs (Tr. at 311). She last used illegal drugs in 2005 because she was put on probation that year (Tr. at 311). Plaintiff was on probation from 2005 through 2008 and her probation officer, whom plaintiff saw once a week, did urinalysis tests frequently (Tr. at 312-313). Plaintiff participated in an inpatient treatment program for a month in Springfield (Tr. at 313). When plaintiff was using methamphetamine, she did not feel "so confused. I didn't feel what I'm feeling now. I didn't feel the emotions and the insecurities and paranoid." (Tr. at 313). Plaintiff had to stop taking her medications while she was pregnant[34] (Tr. at 314).

During the relevant time period, plaintiff spent her day cleaning her house (Tr. at 317-318). Plaintiff does not take care of her own money, her kids' grandmother does (Tr. at 319). Plaintiff did not manage her own money from 2006 to 2010 either; it was too difficult (Tr. at 319-320). She had crying spells sometimes daily during that time (Tr. at 320). The crying spells usually lasted longer than an hour (Tr. at 322). She got angry, irritated, aggravated and annoyed with people (Tr. at 322). Her boyfriend would ask what was wrong, and she would get angry because she didn't know what was wrong (Tr. at 323). Plaintiff had difficulty focusing -- she could start a movie but she could not watch the entire thing because she was unable to follow it (Tr. at 324).

---

[34]This occurred several years after the relevant time period.

Plaintiff may have smoked marijuana once or twice since 2005, she does not remember (Tr. at 324-325). She has not used marijuana or methamphetamine regularly since 2005 (Tr. at 325).

Plaintiff's cleanliness is a problem for her (Tr. at 325). She has to make sure the sink is clean, the counters are clean, everything is put away, everything is facing the proper way, etc. (Tr. at 325). She is very particular about organization and cleanliness, and she has been this way for a very long time (Tr. at 325-326). These things consume her entire day and keep her from being able to do other things (Tr. at 326).

## V. FINDINGS OF THE ALJ

Administrative Law Judge Christina Young Mein entered her opinion on January 24, 2013 (Tr. at 258-271).

Step one. Plaintiff did not engage in substantial gainful activity from November 13, 2006, through April 1, 2010 ("the relevant period") (Tr. at 260).

Step two. Plaintiff suffered from the following severe impairments during the relevant period: bipolar disorder, panic disorder with agoraphobia, obsessive compulsive disorder, amphetamine dependence in early remission, history of cannabis abuse, borderline personality traits, and attention deficit hyperactivity disorder (Tr. at 260).

Step three. Plaintiff's impairments did not meet or equal a listed impairment (Tr. at 261-263). The ALJ considered listings 12.04, 12.06, 12.08 and 12.09 (Tr. at 261).

I note that the prior administrative law judge concluded that the claimant's conditions met Listing 12.09, finding that drug and alcohol abuse was material to the conclusion of disability. However, this prior decision appears to be based on

a misapplication of facts. The prior administrative law judge concluded that the claimant was not actually in remission from substance abuse as she alleged. However, the record as discussed below, demonstrates that the claimant has been sober from amphetamines since at least March 2006. The claimant has also maintained relative sobriety from marijuana since that time, although she last relapsed on that substance in January 2009. The claimant has maintained sobriety reflecting that her symptoms do not meet the severity criteria of Listing 12.09.

Furthermore, I note that the below analysis accounts for all of the claimant's impairments, including her history of methamphetamine and marijuana abuse. However, considering the effects of all impairments, including the claimant's drug abuse, the claimant's impairments did not result in significant work related limitations that would either meet or equal a listing or prevent the performance of substantial gainful activity. Thus, I specifically conclude that the claimant does not meet or equal Listing 12.09. As such, the claimant's drug abuse is not material to the finding of disability. This finding is supported by the detailed opinion of George Davis, Ph.D. . . .

(Tr. at 262).

Step four. Plaintiff's subjective complaints are not entirely credible (Tr. at 264).

[T]he record documents significant gaps in treatment and sporadic attendance of various treatment efforts to control her symptoms. The claimant was absent from treatment for four months in 2006. Elizabeth Bhargava, M.D., the claimant's treating psychiatrist, noted in October 2006 that the claimant had missed her last couple of appointments. The claimant briefly participated in individual therapy in 2006. However, in February 2007, Dr. Bhargava noted that she had missed a number of appointments. The claimant did not follow up with Dr. Bhargava's recommendation for case management in April 2008. She also had not been in therapy for a very long time.

The record also documents numerous times where the claimant unilaterally changed her medications or was neglectful of taking her medications for extensive periods. In March 2006, the claimant reported that she was not using her medications (Ex. 1F/10). The claimant reported stopping her medications unilaterally in October 2006 secondary to her attempts to conceive a child -- resulting in increased symptoms (Ex. 1F/5). In February 2007, the claimant was again off her medications (Ex. 8F/13-14). Progress notes from May 2007 showed that the claimant continued to stop taking her medications without orders from her doctor (Ex. 8F/11). Dr. Bhargava noted increased symptoms in January 2008, again secondary to the claimant being off medications for two weeks (Ex.

8F/3). I note that the claimant did not take her medications from July 2008 through at least January 12, 2009 (Ex. 9F/5-6). Indeed, the claimant's pattern is documented by periods of non-compliance resulting in increased symptoms triggering a return to treatment (Ex. 13F3-7). Finally, in February 2010, the claimant had stopped taking the majority of her medications (Ex. 13F/18).

(Tr. at 264-265).

The ALJ found plaintiff not credible based on her non-compliance (Tr. at 265).

"[T]he record indicates that she does well when she is compliant with medications. . . .

Overall, the record documents that the claimant's symptoms can be reasonably well

controlled when she is compliant with medications." (Tr. at 265).

In this regard, Richard Lucas, M.D., has opined that the claimant's non-compliance is related to her impairments. However, I note that Dr. Lucas provides no rationale, explanation or examples of why this is the case. Indeed, I note that Dr. Lucas did not treat the claimant during her extensive periods of non-compliance and it is unclear if he would even have knowledge of the reasons for her failure to comply with treatment. Elizabeth Porter, ARNP, noted that this was more of a behavior pattern for the claimant than a direct consequence of her impairments (Ex. 13F/6). The claimant did not report to Dr. Bhargava that she was unable to make appointments due to her impairments or symptoms. Instead, Dr. Bhargava's notes indicate that the claimant's symptoms of agoraphobia are related to her failure to maintain consistent treatment versus the cause of her non-compliance. Specifically, the claimant reported fears of leaving the house only after she had been absent from treatment for six months (Ex. 9F/5-6). Thus, I give no weight to Dr. Lucas' opinion regarding the cause of the claimant's non-compliance as it is speculative and not supported by substantial evidence.

(Tr. at 265).

The ALJ gave significant weight to the opinion of medical expert Dr. Davis who

"had the opportunity to review the entire record in authoring his opinion. . . . Dr. Davis

specifically noted that the claimant's episodic exacerbations were related to relapses on

marijuana, non-compliance with medications, and gaps in medical treatment. However,

43

he failed to note that the claimant's impairments were responsible for her inability to comply with recommended treatment. I also note that Dr. Davis's opinion is generally consistent with the opinions of the State agency psychologist, Kenneth Burstin, Ph.D., dated March 8, 2007. . . . Dr. Davis's opinion is also supported by the overall conclusion and findings of Dr. Forsyth, dated February 2007." (Tr. at 268).

The ALJ gave "no weight" to the medical source statements of plaintiff's treating psychiatrists, Dr. Bhargava and Dr. Lucas, because the ALJ found that they were inconsistent with progress notes "showing the claimant to be well compensated when motivated to maintain compliance with therapy." (Tr. at 269).

The ALJ found that plaintiff retains the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She is capable of simple, routine, and repetitive tasks requiring only occasional decision making and occasional changes in the work setting. She is unable to tolerate any interaction with the public in the performance of job duties, but she is able to work in settings with occasional interaction with coworkers. However, she is unable to do tandem tasks. She requires a fairly isolated work area such that she is unable to work in cooperation with coworkers to complete tasks (Tr. at 263). Plaintiff has no past relevant work (Tr. at 269).

Step five. Plaintiff is capable of performing work available in significant numbers including shuttle spotter, riveting machine operator, bottling line attendant, and bindery machine feeder (Tr. at 270). Therefore, plaintiff was not under a disability prior to April 1, 2010 (Tr. at 271).

## VI.   SUBSTANTIAL EVIDENCE TO SUPPORT THE ALJ'S FINDINGS

Plaintiff argues that the ALJ erred in failing to weigh the medical opinions properly and in failing to perform a proper credibility analysis prior to assessing plaintiff's residual functional capacity.  I agree.

At step four of the sequential evaluation process, the ALJ must assess a claimant's residual functional capacity.  20 C.F.R. § 416.920; SSR 96-8p.  A claimant's residual functional capacity is the most that person can do, considering the effects of all impairments on the claimant's ability to perform work-related tasks. 20 C.F.R. § 416.945.  Although the determination of a residual functional capacity is a medical question, it is an administrative finding.  The ALJ has the duty to formulate a residual functional capacity based on all the relevant, credible evidence of record, including the medical records and the claimant's own statements.  McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).  "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole."  Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003).  See also Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) ("The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.").  A consultative examiner's opinion may only be entitled to more weight than that of a treating physician "when the [treating] physician's opinion amounts only to a conclusory statement."  Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1994) (citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991)).

45

In this case the ALJ discredited plaintiff's subjective complaints based in large part on her record of noncompliance. The ALJ found that plaintiff's noncompliance was her own choice rather than a result of her mental condition and, in doing so, completely discredited the opinions of plaintiff's treating psychiatrists in favor of the opinions of non-examining, non-treating psychologists George Davis and Kenneth Burstin and non-treating psychologist Robert Forsyth.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

The ALJ gave "no weight" to the opinions of Dr. Bhargava and Dr. Lucas, plaintiff's treating psychiatrists. In her discussion explaining why these opinions were given no weight, the ALJ repeatedly mischaracterized the record.

> Elizabeth Bhargava, M.D., the claimant's treating psychiatrist, noted in October 2006 that the claimant had missed her last couple of appointments (Ex. 1F/5). The claimant briefly participated in individual therapy in 2006 (Ex. 2F/11-18). However, in February 2007, Dr. Bhargava noted that she had missed a number of appointments (Ex. 8F/13-14). The claimant did not follow up with Dr. Bhargava's recommendation for case management in April 2008. She also had not been in therapy for a very long time (Ex. 8F/1).

(Tr. at 264).

In the exhibit cited by the ALJ (1F/5), Dr. Bhargava actually stated the following: "[H]er mood has dropped. She has got increased panic attacks and agoraphobia. She has not left the house for two weeks. She is very distraught. She missed her last couple of appointments for this reason. Finally her husband kicked her out and told her to get the help that she needed." (Tr. at 141). In Exhibit 8F at 13-14, Dr. Bhargava wrote, "Ms. Foster states that she moved out of her home with her two daughters. They have now found other housing. . . . She had a couple of really rough months. She missed a number of appointments. She has been somewhat paranoid in the new home, because there is no other adult at home." (Tr. at 223). Finally in 8F at 1, Dr. Bhargava noted that plaintiff had "not kept any of her appointments with Case Management and was told that she needed a new referral if she was to restart. . . . I reinitiated a referral for Case Management. She is to mention that she has been having enough Agoraphobia that she has not been leaving the house as needed." (Tr. at 211).

The ALJ continued:

> [T]he record indicates that she does well when she is compliant with medications. Early therapy records show that the claimant was doing well with her therapy and medications with a normal mood and affect (Ex. 1F/12-14, 16).

(Tr. at 265).

In this record, Dr. Bhargava wrote that plaintiff was rocking in her chair, her mood was depressed and anxious, insight was limited, and she had a GAF of 45. This was plaintiff's first appointment with Dr. Bhargava and nowhere in this record does Dr. Bhargava state that plaintiff was doing well with therapy and medications and had a normal mood and affect (Tr. at 148-150). The final page cited by the ALJ is a record of nurse Patricia Carson which does not discuss plaintiff's therapy and medications, rather it states that plaintiff was having pain in her joints and a sense of her muscles always being tense and unable to relax. Her lab work was abnormal. Her anti-anxiety medications were increased (Tr. at 152).

> In April 2006, Dr. Bhargava noted improved symptoms with medications (Ex. 1F/9). After completing drug rehabilitation in June 2006, the claimant was noted to be stable with a normal mood (Ex. 2F/9-10).

(Tr. at 265).

In Ex. 1F at 9, Dr. Bhargava wrote, "Appears to be doing better, continued symptoms however." (Tr. at 145). She noted that plaintiff was still irritable and dealing with obsessive compulsive behavior (Tr. at 145). In Ex. 2F at 9-10, a social worker (not a doctor) noted that plaintiff "appears more stable than I have seen her in the past. Although she has a negative outlook she has persevered through very difficult circumstances that she did not think possible." (Tr. at 163). This was in relation to plaintiff having recently been discharged from inpatient treatment which she said was not like she had expected and left her feeling discouraged (Tr. at 163).

> Indeed, during this period of compliance the claimant was doing well with no rocking and less anxiety (Ex. 1F/7-8). However, her symptoms resumed when she stopped her medications to get pregnant (Ex. 1F/5).

48

(Tr. at 265).

Although the ALJ cites Ex. 1F/7-8 and refers to a "period of compliance" during which plaintiff was "doing well with no rocking and less anxiety," that record actually pertains to plaintiff's visit with Dr. Bhargava on August 29, 2006, after not having seen Dr. Bhargava for the past four months (Tr. at 143). Plaintiff had been taken off her psychiatric medications because she had a tubal pregnancy and had to undergo surgery. "Since her return home [from the hospital] she has her good days and bad days but lately she has been more emotional and has been crying. She gets fairly irritable with her kids to the point that they do not want to be around her. . . . She did look a lot less anxious than I have seen her before. She is able to sit in the chair without rocking. She tells me today is a good day." (Tr. at 143).

> In February 2007, the claimant reported that her medications were helpful when she took them (Ex. 8F/13-14). I note that the claimant's alleged visual and auditory hallucinations began during a period of medication non-compliance (Ex. 8F/9). However, they resolved with medications (Ex. 8F/5).

(Tr. at 265).

Exhibit 8F at 9 is a record dated August 3, 2007 (Tr. at 219). Plaintiff described an overwhelming sense of needing to close the doors and windows and keep the room dark (I assume this is the "visual and auditory hallucination" referred to by the ALJ, because it is the only thing discussed in this record). There is no indication that plaintiff was noncompliant with her medications. In fact, under "plan," Dr. Bhargava wrote, "continue" Depakote and Hydroxyzine and she "increased" plaintiff's Clomipramine, indicating that plaintiff had been taking those medications.

49

> Overall, the record documents that the claimant's symptoms can be reasonably well controlled when she is compliant with medications.
>
> In this regard, Richard Lucas, M.D., has opined that the claimant's non-compliance is related to her impairments (Ex. 19F). However, I note that Dr. Lucas provides no rationale, explanation or examples of why this is the case. Indeed, I note that Dr. Lucas did not treat the claimant during her extensive periods of non-compliance and it is unclear if he would even have knowledge of the reasons for her failure to comply with treatment. . . . Thus, I give no weight to Dr. Lucas'[s] opinion regarding the cause of the claimant's non-compliance as it is speculative and not supported by substantial evidence.

(Tr. at 264).

Although the ALJ criticizes Dr. Lucas for failing to provide a rationale, explanation or examples, I point out that this form was a form provided by Disability Determinations, and nowhere on the form does it ask for a rationale, explanation or examples (Tr. at 569). It specifically asks: "[D]o you believe non-compliance is volitional or related to the claimant's psychiatric disorder itself?" Dr. Lucas wrote, "Most likely disorder." (Tr. at 569). Further, the ALJ's speculation that Dr. Lucas may not have knowledge of the reasons for plaintiff's failure to comply with treatment because he was not her treating psychiatrist during part of that time is equal justification to discredit the opinions of the non-examining and non-treating doctors, as they relied solely on the treatment records to formulate their opinions and as a result were not treating plaintiff at that time either. Dr. Lucas treated plaintiff from September 2009 and beyond the end of the relevant period in this case. He continued to change plaintiff's medication at each visit because she continued to experience the same symptoms despite his treatment.

> Elizabeth Porter, ARNP, noted that this was more of a behavior pattern for the claimant than a direct consequence of her impairments (Ex. 13F/6). The claimant did not report to Dr. Bhargava that she was unable to make

50

appointments due to her impairments or symptoms.  Instead, Dr. Bhargava's notes indicate that the claimant's symptoms of agoraphobia are related to her failure to maintain consistent treatment versus the cause of her non-compliance.  Specifically, the claimant reported fears of leaving the house only after she had been absent from treatment for six months (Ex. 9F/5-6).

(Tr. at 265).

Ms. Porter's record at Ex. 13F/6 does not state that plaintiff's noncompliance was a pattern:  "Records indicate she has been rather noncompliant with followup, missing many appointments. She claims it is because of her agoraphobia; however, she apparently does not call to cancel." (Tr. at 535).  Ms. Porter, who had just started seeing plaintiff 26 days earlier, does not state where she got the information about plaintiff not calling to cancel, and I did not find any such notations in the medical records before me.  In any event, if this is indeed the opinion of this nurse, it directly contradicts the opinion of plaintiff's treating psychiatrist as reflected in the psychiatrist's treatment notes (Tr. at 211).  Finally, the ALJ's characterization of plaintiff not reporting fears of leaving her house until after she had been absent from treatment for six months is wholly contradicted by the record:  See Tr. at 137-140, 141, 148-150, 153, 189-191, 211-212, 225, 233-235, 23-237, 240-241, 535-536, 608-609.

I give some weight to the observations, findings, and conclusions contained in Dr. Forsyth's examination report (Ex. 4F).  I cannot give greater weight to Dr. Forsyth's conclusions and opinions as the record reflects that the claimant may not have been forthright with Dr. Forsyth regarding her history and activities.[35]

---

[35]Specifically the ALJ mentions the fact that the record in places says plaintiff's parents divorced at age 2 but in other places it says her parents divorced when she was 3; that in some records the father of her twins was referred to as her spouse but in other records she indicates that she was not legally married -- "Given the claimant's frequent inability to give a consistent medical and treatment history, her alleged symptoms are also in jeopardy of not being reliable." (Tr. at 266).  I note that these

51

(Tr. at 265-266).

. . . I give significant weight to the opinion of the medical expert, Dr. Davis (Ex. 25F). Dr. Davis had the opportunity to review the entire record in authoring his opinion. Dr. Davis cited to specific portions of the record that he relied upon in making his conclusions. Dr. Davis specifically noted that the claimant's episodic exacerbations were related to relapses on marijuana, non-compliance with medications, and gaps in medical treatment. However, he failed to note that the claimant's impairments were responsible for her inability to comply with recommended treatment. . . .

Dr. Davis's opinion is also supported by the overall conclusion and findings of Dr. Forsyth, dated February 2007. Dr. Forsyth concluded that the claimant was able to understand and remember simple instructions and sustain concentration when motivated to do so (Ex. 4F). Overall, the opinions of Dr. Davis, Dr. Burstin, and Dr. Forsyth are supported by the detailed progress notes of Dr. Bhargava, which show adequate symptom control with mediation [sic] compliance and adherence to a treatment regimen.

The record contains two medical source statements from the claimant's treating psychiatrists, Dr. Bhargava and Dr. Lucas (Ex. 9F/7-8; 14F). These two opinions are inconsistent with the record as a whole, including Dr. Bhargava's progress notes discussed above, showing the claimant to be well compensated when motivated to maintain compliance with therapy. . . . Additionally, I note that Dr. Lucas'[s] initial progress notes show significant symptoms of pacing, agitation, and anxiety (Ex. 13F/10, 12, 14). However, Dr. Lucas also prescribed stimulants that actually increased the claimant's symptoms (Ex. 13F/16). After achieving a moderate level of medication stability, the claimant was noted to be able to settle down and interact appropriately (Ex. 13F/18). Therefore, I conclude that the evidence as a whole fails to support the degree of limitation detailed in these two opinions, thus they are given no weight.

(Tr. at 268-269).

George Davis, Ph.D., reviewed plaintiff's medical records and provided an

opinion without having examined plaintiff (Tr. at 616-636). His only pertinent[36] finding is

_____

inconsistencies are hardly a basis for finding plaintiff not credible, and they do not constitute inconsistencies in her "medical and treatment history."

[36]He found that plaintiff had moderate restriction of activities of daily living; moderate to marked difficulties in maintaining social functioning; and moderate difficulties in

that plaintiff's limitations would not be disabling if drug use were to stop, and he based

this opinion on the fact that her GAF score on May 28, 2008, was 62, but on January

12, 2009, it was noted to be 50 and she had used marijuana once in that intervening

time (Tr. at 636).

On January 12, 2009, Dr. Bhargava noted that plaintiff had run out of her

medications months earlier, that she had been terrified of leaving her house and had

not shown up for two appointments, that she had been having visual hallucinations.

Her depression, anxiety and compulsive behaviors had increased. She and her

children had been forced to move in with her ex-boyfriend because she was unable to

take care of herself and her kids. Plaintiff reported having taken a few hits of marijuana

at some point during the previous six months but said it made her feel paranoid. My

reading of this record is not that the few hits of marijuana was the cause of plaintiff's

increased symptoms resulting in a lower GAF assessment. Dr. Davis did not address

any of the other factors which likely contributed to plaintiff's lower GAF assessment on

this date. Additionally, he did not provide any opinion at all about whether plaintiff's

mental condition is the cause of her noncompliance with treatment -- the fact that it is

not addressed by Dr. Davis is not an appropriate basis for the ALJ's finding that Dr.

Davis believes plaintiff's condition is not responsible for her noncompliance. In fact, Dr.

Lucas (plaintiff's treating psychiatrist) was specifically asked by SSA for his opinion on

---

maintaining concentration, persistence, or pace (Tr. at 630). This is more restrictive
than that found by Dr. Burstin but less restrictive than that found by Dr. Aram in his
second opinion.

Case 6:14-cv-03477-REL   Document 18   Filed 11/05/15   Page 53 of 55

this issue -- Dr. Davis could have been as well if the ALJ intended to rely on that as a basis for crediting or discrediting his opinion.

Based on the summary of plaintiff's medical records above, I find that the ALJ's opinion that plaintiff is well compensated when motivated to maintain compliance with therapy is not supported by substantial evidence in the record. The opinions of Dr. Bhargava and Dr. Lucas, which were given no weight by the ALJ, are well supported by their own treatment notes in addition to the medical records of nurses, counselors, and even medical professionals who treated plaintiff's conditions unrelated to her mental health condition; and all of those records are consistent with plaintiff's testimony.

## VII. CONCLUSIONS

Based on all of the above, I find that the ALJ erred in failing to give good reason for discrediting the opinions of plaintiff's treating psychiatrists and in improperly giving controlling weight to the opinion of a non-examining, non-treating psychologist. As a result, I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff was not disabled during the relevant time.

It is

ORDERED that plaintiff's motion for summary judgment is granted. It is further

ORDERED that the decision of the Commissioner is reversed. It is further

ORDERED that this case is remanded for an award of benefits covering the time period commencing November 13, 2006, and ending March 31, 2010 (the day before she was previously found disabled).

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 4, 2015